## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

ANTHONY JAMES DIDOMENICO

                          Plaintiff,

      v.                                        1:14-CV-737
                                             (TJM/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.

---

HOWARD D. OLINSKY, ESQ., for Plaintiff
TOMASINA DiGRIGOLI, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

### REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.  PROCEDURAL HISTORY

On, November 1, 2010, plaintiff protectively[1] filed an application for Disability Insurance Benefits ("DIB"), and an application for Supplemental Security Income ("SSI"), alleging disability beginning November 5, 2009. (Administrative Transcript ("T") at 90, 91, 237). The applications were denied initially on March 22, 2011. (T. 90, 91).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on February 5, 2013. (T. 66-89).  At the hearing, the ALJ took plaintiff's

---

[1] The term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. If a statement meeting the requirements of the regulations is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

testimony and the testimony of Vocational Expert ("VE") Esperanza DiStefano. (*Id.*) On February 20, 2013, ALJ Milagros Farnes found plaintiff was not disabled from November 5, 2009 through the date of the decision on February 20, 2013. (T. 96-104). ALJ Farnes's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on April 24, 2014. (T. 1–6).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or Supplemental Security Income ("SSI") disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a) (3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, the Commissioner next
> considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities.  If the claimant suffers such an impairment, the third inquiry is

2

whether, based solely on medical evidence, the claimant has an impairment
which meets or equals the criteria of an impairment listed in Appendix 1 of
the regulations. If the claimant has such an impairment, the Commissioner
will consider him [per se] disabled . . . . Assuming the claimant does not
have a listed impairment, the fourth inquiry is whether, despite the
claimant's severe impairment, he has the residual functional capacity to
perform his past work. Finally, if the claimant is unable to perform his
past work, the Commissioner then determines whether there is other work
which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that his impairment prevents him from performing

his past work, there is a "limited burden shift to the Commissioner" to "show that there

is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d

303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin,*

*Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence

is "'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more

than a scintilla" of evidence scattered throughout the administrative record. *Id.*

However, this standard is a very deferential standard of review " – even more so than

the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial

evidence, a reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.   **FACTS**

Plaintiff was born on May 8, 1972, and was 40 years old at the time of the ALJ hearing in February of 2013. (T. 69). Plaintiff is 5'8" tall and weighs 135 pounds. (T. 70). He lives in an apartment with his brother, niece, and nephew. He testified that he attended school until the ninth grade in Special Education classes, but never obtained his General Equivalency Diploma (GED). (T. 70-71). Plaintiff testified that his last job was for a roofing company. (T. 71). He only worked for the summer, and he stated that they did not want to hire him back because he could not do the work. (T. 71-72). Plaintiff also worked for a year at BJ's stocking shelves. (T. 72). He left that job because he had a car accident which required plaintiff to have pins surgically implanted

in his "leg."[2] (T. 73). Plaintiff stated that he could not remember any other jobs that he had prior to BJ's. (T. 72-73).

Plaintiff testified that he could not return to work because he could not put much pressure on his left leg. (T. 73). If he walked for a long period of time, it hurt. (*Id.*) Plaintiff stated that, after the surgery, the only treatment for his leg that he has received is physical therapy. (T. 74). Plaintiff also stated that if he lifts a heavy weight, his leg hurts, but that he could walk one or two miles.[3] (*Id.*) Plaintiff also stated that he had pain in his low back "all the time." (*Id.*) Plaintiff took only aspirin for the pain, but stated that it did not work that well. (*Id.*) Plaintiff testified that he told his doctor that every time he walked, he heard "popping" noises, but the doctor told him that was "normal." (T. 75). Plaintiff also stated that the doctor did not tell him anything about "not being able to be on it for a long time." (*Id.*)

Plaintiff played video games all day, and he did not have to take breaks while playing. (T. 75-76). "I can play the game for a while." (T. 76). Plaintiff testified that he had trouble concentrating, but that his concentration was not worse after the accident – "it's always been that way." (T. 84). Plaintiff can cook, he puts the dishes in the dishwasher, and does his own laundry. (T. 76). Plaintiff later testified that when he does the laundry or the dishes, bending and lifting up, and bending and twisting bother him. (T. 84). His niece and nephew help with the chores around the house. (T. 76). His brother does the food shopping because the last time that he sent the plaintiff, he "forgot a lot of things." (*Id.*) Plaintiff testified that he has had trouble remembering

---

[2] The pins were actually placed in his hip. (T. 351-52) (description of operation).

[3] Plaintiff actually stated that "I can't walk probably like two miles, a mile." (T. 74). Based on the ALJ's question it appears that plaintiff was estimating how far he could walk.

things since he was a child, and that his brother has to remind him. (T. 76-77). Plaintiff also testified that he has trouble paying attention and could not sit through a two-hour movie and explain what it was about at the end. (T. 77). Plaintiff testified that the pain in his leg was about a six-out-of-ten, and the pain in his back was "at eight." (T. 77). Although he is able to shower, get dressed, and take care of his own personal needs, he testified that he falls down "a little" when he puts on his clothes. (*Id.*) His brother takes care of paying the bills. (*Id.*)

Plaintiff testified that he can "comfortably" lift 25 pounds and that his doctor told him not to lift more than 35 pounds. (T. 78). Plaintiff estimated that he could stand for approximately one and one half hours before his left leg starts to "tingle," that he could sit for "an hour or a couple of hours," and that he could walk for approximately two hours or "two blocks." (T. 78-79). He had trouble climbing stairs in the cold because his leg started "popping." (T. 79).

Plaintiff had trouble reading, and testified that he could not read "big words." He had trouble with spelling and math. He had trouble balancing a checkbook or making change. (T. 79-80). Plaintiff could drive, but did not drive "too much," and he testified that he could sit in the car for about two hours before his lower back begins to bother him and his leg begins to tingle. (T. 80).

The ALJ reviewed the duties that plaintiff performed at his prior work. These duties included lifting up to 75 pounds at the roofing companies. (T. 81, 83). He also lifted up to 75 pounds at BJ's in addition to being on his feet most of the time. (T. 81-82). When he worked for a bus company, he cleaned buses. (T. 82). Even though he was not required to lift anything at the bus company job, he did have to bend and kneel, while washing the windows and cleaning the seats in the bus. (*Id.*)

The ALJ took the VE's testimony. (T. 84-88). The ALJ asked the VE to assume that plaintiff was limited to light work, with a sit/stand option; limited to simple, routine tasks; must not be subject to production rate or pace work; needs reminders of tasks one to two times per day; and must not be required to climb stairs. (T. 85-86). The VE responded that although plaintiff could not perform any of his prior jobs, he could do three specific jobs – mail clerk, assembler, or ticket taker. (T. 86-87). These jobs would still be available to an individual who had one unexcused absence from work per month. (T. 87). However, the VE testified that most employers only tolerate an employee being 10% off-task, so that if an individual were 20% off-task during the day, there would be no jobs available for such an individual. (T. 88).

The medical records in this case are limited. There are records from plaintiff's hospitalization at St. Joseph's Hospital for a collapsed lung in July of 2009.[4] (T. 297-317). There are also records from plaintiff's post-car accident surgery in 2010. (T. 348-366). Plaintiff was treated at Upstate Medical University by orthopedic surgeon, Robert B. Simpson, M.D. (*Id.*) Plaintiff was hospitalized from November 5, 2010 until November 12, 2010. During that time, Dr. Simpson performed a fixation of the pelvic fracture that plaintiff suffered as a result of his car accident. (T. 349-50) (Discharge Summary).

Plaintiff underwent a consultative physical examination on February 22, 2011, by Dr. Robi Rosenfeld, D.O and a consultative psychological evaluation by Steven F. Coleman, Psy.D. (T. 318-23, 367-79). Dr. Coleman's report is dated January 14, 2013.

---

[4] On July 6, 2009, plaintiff had a "spontaneous pneumothorax" after developing shortness of breath. (T. 298). He went to the emergency room and was treated and monitored until July 11. 2009. (*Id.*) He was discharged with instructions to avoid strenuous activity. (T. 298-99). Plaintiff has had no subsequent recurrences of this condition.

The report includes a narrative section (T. 370-73) and a Medical Source Statement in which he checked boxes relating to the "Mental Abilities and Aptitudes Needed to Do Unskilled Work" (T. 367-69). The record also contains some brief Education Records from the Guilderland Central School District. (T. 380-87). Rather than further detailing the medical evidence at the outset, relevant details regarding the medical and other evidence, including the medical opinion evidence, are discussed below as necessary to address the issues raised by plaintiff.

## IV.  **ALJ'S DECISION**

After finding that plaintiff met his insured status until September 30, 2014, the ALJ found that plaintiff has not engaged in substantial gainful activity since his onset date of November 5, 2009, notwithstanding an "unsuccessful work attempt" as a roofer.[5] (T. 98). Plaintiff was unable to perform the physical requirements of the job. (*Id.*) At step two of the sequential analysis, the ALJ found that plaintiff's impaired mental functioning, adjustment disorder, and status post hip surgery were "severe" impairments. (T. 98).

At step three, the ALJ found that plaintiff did not have a Listed Impairment. (T. 99-100). In making this determination, the ALJ considered Listing 1.02 – "Major Disfunction of a Joint." (T. 99); *See* 20 C.F.R. Pt. 404, Subpt. P, App.1, § 1.02. Plaintiff's ability to walk two miles prevented him from meeting the requirement in the Listing that the claimant be "unable to ambulate effectively." *Id.* App.1, § 1.02(A).

The ALJ also considered whether plaintiff met any of the Listings based on

_____

[5] The unsuccessful work attempt was after plaintiff's onset date, and is apparently the job that plaintiff was referring to during his testimony as his "final" job. (T. 71-72). He testified that the company did not call him back after the summer because he could not do the job. (*Id.*)

mental impairments. He considered Listing 12.05(C) – "Intellectual Disability," based on plaintiff's valid IQ of only 66. (T. 99). However, the ALJ found that plaintiff did not meet the other criteria of this listing because he had only "minimal" issues with his adjustment disorder and had no other mental impairments. (*Id.*) The ALJ also considered Listing 12.04 – "Affective Disorders" and Listing 12.06 – "Anxiety Related Disorders." (T. 99-100). In determining that plaintiff did not meet these listings, the ALJ found that plaintiff did not satisfy the limitations required by "paragraph B" of the Listings. (T. 99). Plaintiff did not have two "marked" restrictions in the categories of activities of daily living; maintaining social functioning; or maintaining concentration, persistence, or pace, nor did he have repeated episodes of decompensation, each of extended duration. (*Id.*) The ALJ also considered the "paragraph C" criteria and found that plaintiff did not have the required episodes of decompensation, nor did he require a "supportive living environment." (T. 100). Finally, the ALJ noted that the limitations in the "paragraph B" criteria did not constitute an RFC evaluation, and that more specific limitations would be reflected in the ultimate RFC determination. (*Id.*)

At step four, the ALJ found that plaintiff had the RFC to perform "light" work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that plaintiff requires an "alternating at-will sit/stand option," and he cannot climb stairs. Considering his mental limitations, he would only be able to perform simple, routine tasks with no production rate or pace work. He would also need one-to-two work reminders during the day. (*Id.*) In making this determination, the ALJ considered the medical records and plaintiff's testimony regarding his limitations. (T. 100-103). The ALJ specifically considered plaintiff's memory problems, his cognitive deficits, and his inability to perform any work requiring production rates or a particular pace of work. He assigned

only "some" weight to the opinions of Dr. Rosenfeld (physical examination) and Dr. Coleman (mental examination), because they each saw plaintiff once. (T. 102). The ALJ assigned no weight to the "state examiner's opinion" because he/she never examined plaintiff. (T. 103).

Further at step four, the ALJ found that plaintiff could not physically perform any of his previous work because each occupation required plaintiff to lift very heavy weight. (T. 103). Because plaintiff had both exertional and non-exertional limitations which would restrict the availability of other work in the national economy, the ALJ consulted a VE. (T. 103-104). The ALJ posed a hypothetical question, detailing plaintiff's RFC, including his physical limitations and the specific mental limitations discussed in the ALJ's decision. Based on this hypothetical, the VE testified that there were jobs that plaintiff could still perform – mail clerk, assembler, and ticket taker. (T. 103-104).

## V.    ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.    The ALJ failed to properly account for plaintiff's mental limitations in his RFC evaluation. (Pl.'s Br. at 8-12) (Dkt. No. 13).

2.    The ALJ's credibility determination is not supported by substantial evidence. (Pl.'s Br. at 12-15).

3.    The ALJ's step five determination is not supported by substantial evidence due to error in the hypothetical question posed to the VE. (Pl.'s Br. at 15-16).

Defendant argues that the Commissioner's determination is supported by substantial evidence and should be affirmed. For the following reasons, this court agrees with the defendant and will recommend that the Commissioner's decision be affirmed and the

complaint be dismissed.

## VI.   RFC

### A.   Legal Standards

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL

3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

## B. Application

Plaintiff argues that in determining plaintiff's RFC, the ALJ erred in failing to properly weigh Dr. Coleman's assessment of plaintiff's mental limitations and failed to give "specific reasons" why he failed to "adopt" these limitations. (Pl.'s Br. at 9). Plaintiff states that "[f]ailure to reconcile the RFC assessment with medical source statements is harmful error as Plaintiff's significant restrictions in social functioning could have reduced any occupational base." (Pl.'s Br. at 11).

However, Dr. Coleman did not assess a "significant restriction in social functioning." (T. 368). In fact, Dr. Coleman assessed "unlimited or very good" ability to "[g]et along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes." (*Id.*) Dr. Coleman also rated as "unlimited or very good" plaintiff's ability to "[a]ccept instructions and respond appropriately to criticism from supervisors." (*Id.*) Dr. Coleman rated plaintiff as "limited but satisfactory" in his ability to ask simple questions or request assistance and in working in coordination with, or in proximity to others without being duly distracted himself. (*Id.*) Plaintiff was also rated as "limited but satisfactory" in his ability to deal with normal work stress. (*Id.*) Finally, plaintiff was rated as "unlimited or very good" in his ability to interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (T. 369). Dr. Coleman stated in his narrative report that although plaintiff had some "significant" cognitive challenges,

"he appeared as a likeable and cooperative individual." (T. 373). There is absolutely no reference to significant restrictions in social functioning.

Plaintiff also argues that the ALJ "failed to include limitations in the RFC which correspond with Dr. Coleman's opinion." (Pl.'s Br. at 11-12). This court does not agree. While the ALJ stated that he only gave "some" weight to Dr. Coleman's report because he only saw the plaintiff once, the ALJ incorporated most of the limitations stated in Dr. Coleman's RFC evaluation into the ALJ's findings. The most serious limitation stated by Dr. Coleman was plaintiff's inability[6] to perform at a consistent pace "based on psychomotor speed."[7] (T. 368). This limitation is reflected in the ALJ's RFC when he states that plaintiff would have to perform work that requires "***no production rate or pace work***." (T. 100) (emphasis added).

Plaintiff also faults the ALJ for failing to reconcile the plaintiff's memory problems, which affect his ability to remember work-like procedures, and understand, remember, and carry out very short, simple instructions. Plaintiff argues that the ALJ also failed to consider plaintiff's limitations in sustaining an ordinary routine, make simple decisions, and respond appropriately in a routine work setting. (Pl.'s Br. at 12). However, the ALJ accounted for these limitations when he stated that the plaintiff

---

[6] Dr. Coleman's RFC evaluation is a "check-box" form. (T. 368-69). With respect to performing at a consistent pace, Dr. Coleman has checked the box indicating that plaintiff is "seriously limited, but not precluded" and has inserted an arrow pointing to the box indicating that plaintiff is "unable to meet competitive standards." (T. 368). The court will assume that plaintiff is unable to meet competitive standards.

[7] The court notes that the box in which this limitation is listed has been altered by Dr. Coleman. The box is printed as follows: "Perform at a consistent pace without an unreasonable number and length of rest periods." (T. 368). Dr. Coleman crossed out "~~without an unreasonable number and length of rest periods~~" and wrote in "(based on psychomotor speed)." (*Id.*)

would have to perform work involving only simple, routine tasks, and would require one-to-two work reminders per day. (T. 100). The ALJ specifically stated that "[t]hese restrictions should adequately accommodate his poor memory and concentration and his low cognitive functioning and anxiety." (T. 102).

Plaintiff argues that these "relatively mild accommodations" were inconsistent with Dr. Coleman's opinion and did not sufficiently describe plaintiff's limitations. As stated above, the ALJ placed only "some" weight on Dr. Coleman's evaluation, in part, because Dr. Coleman had only examined plaintiff once. Plaintiff also criticizes the ALJ for this alleged error. However, in determining the weight to give any medical source, including a treating source, the regulations specifically *allow* the consideration of the nature and extent of the treatment relationship and the length of the treatment relationship. 20 C.F.R. §§ 404.1527(c), (c)(2)(i) & (c)(2)(ii), 416.927(c), (c)(2)(i) & (c)(2)(ii).

In making the RFC determination and weighing Dr. Coleman's opinion, the ALJ noted that Dr. Coleman referred to plaintiff's cognitive deficits as "mild," (T. 373), and the ALJ pointed out that plaintiff worked at various jobs while having the same cognitive deficits. (T. 102). There is no indication that plaintiff's mental impairments have gotten worse or are different than when he worked at BJ's before his auto accident.[8] (T. 102). In fact, plaintiff told Dr. Coleman that if it were not for the car accident and his physical restrictions, he would still be working at BJ's, a position that he held for a year prior to his accident. "Mr. DiDomenico states that but for the car

---

[8] At the hearing, plaintiff testified that he had trouble remembering things "since [he] was a kid." (T. 76).

accident, he would likely continue to be working at a local BJ's, stocking shelves, a job that he very much liked." (T. 370). Plaintiff left BJ's because he could not physically perform the work, not because he had any mental issues with his job. (T. 72 – testimony). Plaintiff also told Dr. DiDominico that he had never been fired from a job. (T. 370).

The ALJ also cited plaintiff's testimony that he played video games "all day." (T. 102). The ALJ stated that this activity shows that plaintiff has strong mental functioning in concentration and decision-making. (*Id.*) Plaintiff testified that he played "Call of Duty" and another game where "you find stuff." (T. 75). The ALJ asked whether plaintiff could play for "two to three-hour periods," or whether plaintiff had to "take breaks." (T. 75). Plaintiff responded that he did not need breaks, and that he could "play the game for a while." (T. 76). As the ALJ correctly noted, this testimony shows that plaintiff could concentrate on a video game for an extended period of time.

The ALJ used the limitations described in Dr. Coleman's report and interpreted these limitations in light of the plaintiff's past work history and activities to which he testified at the hearing. Plaintiff argues that the ALJ failed to explain which portions of the report should be adopted or provide any reasons why portions of the report should be rejected. The ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *Mongeur, supra.* In any event, it is clear that the ALJ did not pick and choose the evidence upon which he relied.

Dr. Coleman is not a treating physician. In fact, plaintiff has no treating

physician because he has never had any treatment for his mental condition.  Even when dealing with a treating physician's report, "where the evidence of record permits the court to glean the rational of an ALJ's decision," the ALJ need not have mentioned every item of evidence, nor does the ALJ need to have explained why he or she considered particular evidence persuasive or not persuasive. *See Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) (quoting *Mongeur*, 722 F.2d at 1040) (internal quotation marks omitted).  In this case, the bases for the weight that the ALJ afforded to both consulting physicians'[9] reports are clear.  The ALJ's decision to give the consultative physicians' reports "some" weight, and to accommodate the stated limitations in his RFC evaluation, but not to the degree plaintiff argues, is supported by substantial evidence.

## VII.  **CREDIBILITY**

### A.  **Legal Standards**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 416.929; *see also Foster*

_____

[9] In his RFC argument, plaintiff does not challenge the ALJ's conclusions regarding his physical limitations, including the weight given to Dr. Rosenfeld's report.

*v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to function. 20 C.F.R. § 416.929(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 416.929(c)(3).

## B.    Application

Plaintiff argues that the ALJ did not properly consider plaintiff's credibility and that the ALJ improperly considered only the medical evidence as a basis for his decision. The ALJ clearly accepted that plaintiff had physical limitations when he found plaintiff could only do light work. Plaintiff testified that he could walk two

miles, and that he sat and played video games all day. Plaintiff also stated that he has had memory problems since childhood. The ALJ credited his memory limitations, but correctly found that plaintiff worked at various jobs with the same limitations. The ALJ essentially found that plaintiff had limitations, but those limitations were not severe enough to preclude substantial gainful employment as testified by the VE.

Plaintiff also argues that "the record as a whole supports Plaintiff's allegations that he has cognitive difficulty." (Pl.'s Br. at 14). Plaintiff cites a "disability examiner's" interview with plaintiff in which the "examiner" states that plaintiff came across as "vacant," he had trouble answering questions, concentrating, and understanding.[10] (T. 238). This interviewer met with plaintiff to complete the "Field Office Disability Report." There is no indication that this interviewer has any medical or psychological qualifications to make any conclusions about plaintiff's limitations.

This examiner also noted that plaintiff had not been able to maintain steady employment and was "fired" for being too slow. (T. 238). Plaintiff apparently included this statement in one of his disability applications. (T. 204). However, there is no indication in the record that plaintiff was ever fired for being slow. He told Dr. Coleman that he had never been fired from a job. (T. 370). The record supports the finding that plaintiff worked at BJ's for at least one year, and that he left because of the car accident, not because of an inability to work fast enough. Plaintiff testified that his

_____

[10] At plaintiff's hearing, although it was clear that he had memory limitations (which he has had from childhood and which he had when he was working), plaintiff appeared to understand and respond appropriately to most of the questions posed by the ALJ and by counsel. For example, he discussed his car accident in a relatively articulate manner. (T. 73). He remembered how it happened. He remembered that the doctor told him he had a hairline fracture. He discussed his pain, that he only took aspirin, and that he was not prescribed any other medications. (T. 74).

unsuccessful work attempt was a roofing job, and he was required to lift 75 pounds and climb ladders while carrying materials. (T. 81). Plaintiff stated that "that's why they never called me back . . . ." (*Id.*) Thus, plaintiff's recent difficulty working was physical, not mental.

Plaintiff argues that the ALJ's assessment that plaintiff's mental capacities are stronger than his IQ suggests is not supported by the record. (Pl.'s Br. at 15). However, the fact that plaintiff was able to maintain employment that he apparently enjoyed shows that his mental abilities were at least great enough to engage in substantial gainful activity. Plaintiff also argues that his ability to play video games has no bearing on his ability to "sustain competitive work activity." (Pl.'s Br. at 15). The ALJ did not make such a sweeping conclusion. The ALJ stated that plaintiff's ability to play video games all day and engage in other activities was indicative of an ability to concentrate on something for an extended period of time, and that his mental capabilities were stronger than his IQ suggested. (T. 99, 102). The first factor in the credibility assessment is the consideration of daily activities. 20 C.F.R. § 416.929(c)(3).

In any event, the ALJ did not doubt that plaintiff had cognitive difficulties, particularly the inability to maintain a pace or sustain a production rate. The ALJ accepted most of the limitations proposed by Dr. Coleman, and incorporated the limitations into his RFC, with the exceptions as noted above. Thus, the ALJ's credibility determination was supported by substantial evidence.

## VIII. <u>VOCATIONAL EXPERT</u>

### A. **Legal Standards**

At step five of the disability analysis, the burden of proof shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). But if plaintiff has non-exertional impairments, and if those non-exertional impairments "significantly limit the range of work" permitted by his exertional impairments, the ALJ may be required to consult a vocational expert ("VE"). *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986).

If the ALJ does use a VE, he presents the expert with a set of hypothetical facts to determine whether plaintiff retains the capacity to perform any specific job. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). The ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009). Where the hypothetical is based on an ALJ's RFC analysis, which is supported by substantial facts, the hypothetical is proper. *Id*. at 276-277. Conversely, a VE's opinion in response to an incomplete hypothetical question cannot provide substantial evidence to support a denial of disability. *See DeLeon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984) (finding that, as a result of the ALJ's failure

to present the full extent of the claimant's physical disabilities to a vocational consultant, the record provided no basis for drawing conclusions about whether the claimant's impairments rendered him disabled).

### B.    Application

Plaintiff argues that the VE's testimony is not supported by substantial evidence because the ALJ's hypothetical question was "incomplete." (Pl.'s Br. at 15-16).  This argument is based on plaintiff's argument that the ALJ's RFC evaluation did not contain sufficient limitations as argued above.  Because this court has found that the ALJ's RFC evaluation was supported by substantial evidence, then the hypothetical question posed to the VE is equally supported, and the court need not analyze it any further.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and plaintiff's complaint be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: July 6, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge